UNITED STATES DISTRICT CORT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

E.L., a minor, by LA'SHIEKA WHITE the )
Mother, legal guardian, and next friend of E.L., )
                                                 )
        Plaintiff,                               )
                                                 )
v.                                               )     Cause No. 4:16-cv-629 RLW
                                                 )
VOLUNTARY INTERDISTRICT CHOICE                   )
CORPORATION,                                     )
                                                 )
        Defendant.                               )


**MEMORANDUM IN SUPPORT OF THE VOLUNTARY
INTERDISTRICT CHOICE CORPORATION'S MOTION TO DISMISS**

SHANDS, ELBERT,
 GIANOULAKIS & GILJUM, LLP

Mark J. Bremer #24696MO
D. Leo Human #59787MO
1 North Brentwood Blvd., Suite 800
St. Louis, Missouri 63101
(314) 241-3963
(314) 241-2409 – fax
mbremer@shandselbert.com
lhuman@shandselbert.com

Attorneys for Voluntary
Interdistrict Choice Corporation

## Table of Contents

Introduction ........................................................................................................................ 1

Background ........................................................................................................................ 1

    The *Liddell* Case .................................................................................................... 1

    The Administration of County-to-City Magnet Transfers by VICC and the Separate
    Administration of Independent Charter Schools .......................................................... 7

    Summary of What Is Alleged and Not Alleged in the Complaint ................................. 8

ARGUMENT ..................................................................................................................... 9

I.    The complaint, for multiple reasons, fails to state a claim and cannot be amended to do
    so. .......................................................................................................................... 9

    A.    As a remedy for adjudicated violations of the Equal Protection Clause, the
        transfer program cannot be challenged as violative of that Clause absent a
        declaration of unitary status in *Liddell*; the complaint fails to allege such a
        declaration, nor could it. ................................................................................... 9

    B.    The transfer program eligibility requirements were expressly approved as
        constitutional by the Eighth Circuit and judgments of this Court; plaintiff's
        lawsuit is thus also an impermissible collateral attack, and is barred by judgment
        preclusion and binding precedent. .................................................................. 11

    C.    Plaintiff's lawsuit is also barred by explicit release provisions in the 1999
        Settlement Agreement approved by this Court. ................................................. 12

II.    Plaintiff lacks standing for multiple reasons .................................................................... 13

    A.    The decision-maker regarding enrollment of plaintiff's son was not VICC, but
        Gateway; there is therefore no present case or controversy between plaintiff and
        VICC, nor was plaintiff's injury caused by or "traceable to" VICC. ............................ 14

    B.    The relief plaintiff seeks cannot "redress" her alleged injury because her alleged
        injury stems from the *Liddell* eligibility requirements, not from action by VICC. .......... 16

    C.    Plaintiff's challenge to VICC's extension of the transfer program, even if
        successful, would not redress her claimed injury in any event, further foreclosing
        her standing. ................................................................................................... 17

    D.    As a matter of sound jurisprudence, the Court need not and should not delve into
        questions of constitutionality where statutory interpretation and the actions of
        third parties may redress plaintiff's claimed injury .............................................. 18

Conclusion ........................................................................................................................ 20

## Introduction

As a matter of overwhelmingly well-settled law, magnet-school transfer programs — whereby white students from predominantly white school districts may transfer into predominately black school districts — are an entirely appropriate and constitutionally permissible desegregation remedy. The County-to-City magnet transfer program administered by VICC is a remedy for the State's and the City school district's adjudicated violations of the Equal Protection Clause in maintaining unlawful race-based school segregation in the City. As such, under unassailable legal precedent, the program (now in the process of phasing out) does not and cannot violate the Equal Protection Clause.

Plaintiff in this case wants her son to attend Gateway Science Academy. Gateway is a charter school, not a magnet school. VICC plays no role in the administration of charter schools and is not involved in their admission decisions. Charter school admission requirements are governed by state statutes that are not in any respect applied, administered or enforced by VICC. If those statutes are not being followed, or if they are constitutionally infirm, that is not an issue that can be remedied by a lawsuit against VICC. Because the injury plaintiff complains of is not connected to any decision, action or authority of VICC, plaintiff lacks standing to bring this lawsuit.

For these and other compelling reasons, all based on settled law and on what her complaint alleges and fails to allege, plaintiff's lawsuit is completely without merit and should be dismissed at the threshold.

## Background

### The *Liddell* Case

The State of Missouri and the City of St. Louis school district are adjudicated violators of the Equal Protection Clause for operating and failing to dismantle a racially segregated school system in the City of St. Louis. *Adams v. United States*, 620 F.2d 1277, 1288 (8th Cir. 1980) (City district and State failed to meet their "constitutional duty to disestablish the dual school system in the City of St.

1

Louis")[1]; *Liddell v. State of Mo.*, 731 F.2d 1294, 1308, 1313 (8th Cir. 1984) (en banc) (*Liddell VII*)
(the "dual system [that defendants] operated for decades with the sanction of law . . . scarred every
student in St. Louis for over five generations"); *Liddell by Liddell v. Bd. of Educ. of City of St. Louis*,
126 F.3d 1049, 1052 (8th Cir. 1997) ("the City Board and the State were jointly responsible for
maintaining a segregated school system").

The race-based interdistrict transfer of black City students to the predominantly white St. Louis
County school districts, and of white County students to magnet schools in the predominantly black
City district, is an appropriate, "constitutional" and, indeed, "necessary" remedy for the adjudicated
unconstitutional race-based school segregation in the City. *Liddell VII*, 731 F.2d at 1297, 1305 ("we
approve . . . [t]he voluntary[2] transfers of students between the city and suburban schools and the
establishment of additional magnet schools . . . in the City School District as necessary to the
successful desegregation of the city schools"; "such transfers comply with constitutional

---

[1] In accordance with standard citation practices, this brief omits references to denials of petitions for
writs of certiorari. Suffice it to say that over the course of the *Liddell* litigation there were dozens of
such petitions, all of which were denied.

[2] The *Liddell* interdistrict transfer program has always been a mandatory remedy *required of* the two
adjudicated violators (the State and City district) while always being consensual and "voluntary" on
the part of the County districts. *Liddell VII*, 731 F.2d at 1308-09; *see also Liddell v. Bd. of Ed. of
City of St. Louis*, 677 F.2d 626, 643 (8th Cir. 1982) (*Liddell V*). The latter is so because there was
never any trial or finding of constitutional violation with respect to the County districts; to the
contrary, they all received final judgments adjudicating them *not* liable for interdistrict school
segregation. *Liddell*, 126 F.3d at 1053; *Liddell by Liddell v. Bd. of Educ. of City of St. Louis*, 96 F.3d
1091, 1094 (8th Cir. 1996). From the inception of the transfer program, the County districts have
thus always been innocent third-party "volunteer[s]" to assist the two adjudicated violators in
remedying their constitutional violations in the City. *Liddell VII*, 731 F.2d at 1308-09; *see also
Liddell v. Bd. of Ed. of City of St. Louis*, 677 F.2d 626, 643 (8th Cir. 1982). The Supreme Court in
*Hills v. Gautreaux*, 425 U.S. 284, 291-92 (1976), authorized the use of such third-party "volunteers"
as part of an otherwise mandatory desegregation remedy, and the Eighth Circuit, based on *Hills*, has
specifically upheld the constitutionality of the voluntary interdistrict transfer program in this case
(now administrated by VICC). *Liddell VII*, 731 F.2d at 1308. The program is also voluntary in the
crucial respect that eligible students transfer only as a matter of free choice, that is, no "forced
bussing." As further demonstrated in VICC's contemporaneously filed brief opposing plaintiff's
motion for preliminary injunction, p. 5, the continuing voluntariness of this transfer program does
not in the slightest undercut its ongoing viability as a constitutional remedy.

standards"); *Liddell v. Bd. of Educ. of City of St. Louis*, No. 4:72CV100 SNL, 1999 WL 33314210, at *2, *9 (E.D. Mo. Mar. 12, 1999) (Limbaugh, Sr., J.) (approving "maintaining the magnet school program" and "the continuing voluntary transfer plan" as "fair, reasonable, adequate and constitutionally permissible").[3]

"Magnet" schools — which attract students in the racial majority to transfer to a school where they are in the racial minority — are a classic desegregation tool: "the utility and propriety of magnets as a desegregation remedy is beyond dispute." *Liddell VII*, 731 F.2d at 1310 (8th Cir. 1984). The purpose of the County-to-City magnet transfer program is "[t]o attract white student transfers to the city" in order to "expand opportunities [of black City students] for an integrated education." *Liddell VII*, 731 F.2d at 1299-1300; *Adams*, 620 F.2d at 1297.[4] This is why, as a matter of sound constitutional remedy and controlling holdings of this and other courts, the transferring students must

---

[3] *See also Adams*, 620 F.2d at 1286 (a remedy to disestablish *de jure* segregation "will almost invariably require that students be assigned 'differently because of their race.' . . . Any other approach would freeze the status quo that is the very target of all desegregation processes."), quoting *McDaniel v. Barresi*, 402 U.S. 39, 41 (1971); *Liddell VII*, 731 F.2d at 1306 ("[t]he opportunity for effective integration became a reality when the county schools agreed to accept the voluntary transfer of several thousand black students").

[4] Approving of such programs, the Supreme Court stated in *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 26-27 (U.S. 1971) that "[a]n optional majority-to-minority transfer provision has long been recognized as a useful part of every desegregation plan." *See also Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 488 (1979) (Powell, J., concurring). A myriad of decisions approving magnets has followed. *See, e.g., Clark v. Bd. of Educ. of Little Rock*, 705 F.2d 265, 269, 272 (8th Cir. 1983); *Arthur v. Nyquist*, 712 F.2d 809, 811–813 (2nd Cir. 1983); *Berry v. School District of Benton Harbor*, 698 F.2d 813, 819-20 (6th Cir. 1983); *United States v. Texas Education Agency*, 679 F.2d 1104, 1110 (5th Cir. 1982); *Hart v. Community School Bd. of Educ.*, 512 F.2d 37, 54–55 (2nd Cir. 1975); *Stout v. Jefferson County Bd. of Educ.*, 483 F.2d 84, 85 (5th Cir. 1973); *Tasby v. Wright*, 520 F.Supp. 683, 741 (N.D. Tex. 1981), aff'd in part, rev'd in part, on other grounds, 713 F.2d 90 (5th Cir.1983); *Smiley v. Blevins*, 514 F.Supp. 1248, 1260 (S.D. Tex. 1981); *and see Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738, 757 (8th Cir. 2011) (magnets and majority-to-minority transfer funding would continue); *United States v. Richland Par. Sch. Bd.*, No. CV 66-12169, 2016 WL 393547, at *4 (W.D. La. Feb. 1, 2016) (approving magnets and majority-to-minority transfers as "comport[ing]" with constitutional requirements); *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 240 (5th Cir. 2014) (reversing district court decision which had rejected expanded magnet school program and abolished race-based criteria in majority-to-minority transfer program).

3

be in the racial majority in their home district, namely, in this case, white students from the County. *See Liddell VII*, 731 F.2d at 1310 ("[t]o be eligible for transfer to the magnet schools, students . . . must be in the racial majority in their home districts"); *Swann*, 402 U.S. at 26 (approving of and emphasizing need for "majority-to-minority transfer" provisions in desegregation plans).

The 1999 Settlement Agreement (hereafter sometimes "Agreement" or "SA"), approved by Hon. Stephen M. Limbaugh, Sr., is a "substitute for" and "continuation of" the "remedial efforts" originally approved by the Eighth Circuit in *Liddell VII*. *Liddell*, No. 4:72CV100 SNL, 1999 WL 33314210, at *4, 9; SA, Exhibit A hereto,[5] p.2; *see also* SA at p.4 ¶ 2, p.62 ¶ 20, p.11 ¶ 9 (providing for "Continuation of Magnet Schools," including continued funding for them and continuation of transfers to them administered by the "New Entity" [*i.e.*, VICC] and requiring all parties to "continue to pursue a policy of desegregation"). The court-approved Agreement specifically acknowledges that "the County-to-City transfers will continue at a substantial level." SA p.54 ¶ C. Judge Limbaugh's 1999 Memorandum and Order, while "dissolv[ing]" the prior injunctions in the case, expressly stated that the ongoing remedial requirements of the Agreement are "approved . . . [as] an appropriate remedy" and are "incorporated herein." *Liddell*, 1999 WL 33314210, at *9. Further confirming the ongoing remedial obligations, this Court has subsequently noted its "continuing jurisdiction" in

---

[5] The Agreement was incorporated by reference into Judge Limbaugh's decision in *Liddell*, 1999 WL 33314210, at *9, and the 1983 Settlement Agreement (Exhibit B hereto) was appended as an exhibit to Judge Hungate's decision approving that settlement, *Liddell v. Bd. of Educ. of City of St. Louis, State of Mo.*, 567 F. Supp. 1037 (E.D. Mo. 1983) (affirmed in pertinent part by *Liddell VII*). These documents may therefore be judicially noticed and considered by this Court as a matter of law. In addition, plaintiff's complaint extensively references the 1999 Settlement Agreement, which in turn references the 1983 Settlement Agreement in numerous places, and the Court may therefore consider these agreements as part of the pleadings in this case. *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1063 n.3 (8th Cir. 2005) ("We may examine the [document] in our consideration of the 12(b)(6) motion to dismiss, even though it was not expressly part of the pleadings, because it was incorporated into the pleadings by reference—the complaint specifically mentioned it as a ground for [plaintiff's] claims against [defendants].").

*Liddell* with respect to various parties and aspects of the remedy.[6]

Judge Limbaugh's decision approving, adopting and incorporating the ongoing remedial programs of the Agreement emphasized the historic nature of the parties' settlement:

> In these days when there is popular concern about the effectiveness of our democratic institutions, it is refreshing for this Court, representing our judicial branch of government, to be a part of a successful settlement process involving a school desegregation case which has the support of the other two branches of government, as well as of the people.

> The United States of America, the State of Missouri, its Governor and Attorney General, numerous state administrative heads, twenty-five school districts, the NAACP and a variety of local entities have proffered a settlement. The Missouri Attorney General has apologized in open court for past state constitutional transgressions. The legislative branch of the State of Missouri has enacted a law that will provide long-term funding of on-going programs to implement school desegregation. The voters of the City of St. Louis have approved by almost a two to one margin a sales tax increase to supplement the funding provided by the Missouri legislature. It is now time for the last player in our democratic process, the judiciary, to be involved in the settlement proceedings. This Court approves the proposed settlement.

> Rarely, if ever, in school desegregation cases and infrequently in class-action suits in general, have government entities and the public shown such amazing support for a settlement. To rebuff this proffer of settlement would be tantamount to an exercise of gross judicial activism . . ..

*Id*. at *6-7.

As contemplated by the Agreement,[7] the County-to-City magnet transfer program is phasing

---

[6] *See*, *e.g.*, Case No. 4:72CV00100-ERW, Docs. 365, 372, 375 (Memoranda and Orders, dated respectively November 16, 2011, September 9, 2013, and September 21, 2015, each noting that the Court has "continuing jurisdiction" or "retains jurisdiction"). This Court's continuing jurisdiction has most recently been invoked by the City district, the *Liddell* plaintiffs and NAACP in a motion concerning funding of charter schools. *See* Joint Motion to Enforce the Settlement Agreement, Case No. 4:72CV00100-ERW, April 11, 2016 [Doc. 381]. In connection with that motion, the United States has also expressed its interest, "[a]s a plaintiff party to the case," "in the appropriate interpretation and enforcement" of the Settlement Agreement. *See* United States' Motion for Modification of Time Limits, Case No. 4:72-cv-00100-HEA, May 20, 2016 [Doc. 395].

[7] The Agreement states that the interdistrict transfer program may "phase out" by as early as 2021-22. SA p.49. It further provides that districts "should be able to devise their own phase-out plan which is gradual, controlled and predictable." *Id*. p.58 ¶ 7. In furtherance of these phase-out provisions, the Agreement provides that the ten-year period for the acceptance of new transfers may be extended by vote of the New Entity. *Id*. p.59 ¶ 8.

out. Affidavit of David Glaser ("Glaser afft.") ¶ 8-10.[8] At its peak, in 1997-98, County-to-City

magnet transfers totaled 1,449. *Id*. Now, there are just 140 students transferring, less than 10% of

the peak number. *Id*. Overall interdistrict transfers are similarly phasing out, from a peak enrollment

at the time of Judge Limbaugh's decision in 1999 of 14,626 students to a current total transfer

student enrollment of 4,583. *Id*. As the program has wound down, extensions of the period for

accepting new transfers, as authorized by the Agreement (*see* n.7, above), have been necessary to

avoid precipitous declines in student enrollment, which would have otherwise caused serious

negative consequences for students and their families, sending and receiving districts, and other

constituencies. *Id*. VICC has recently promulgated a strategic plan for fully phasing out the race-

based transfer program. *Id*.

There has never been any finding in the *Liddell* case that the vestiges of the dual (segregated)

school system in the City have been eradicated to the greatest extent practicable, nor has there ever

been any declaration of "unitary status." The term "unitary status" nowhere appears in the

Agreement or Judge Limbaugh's decision approving it, other than the decision's mention of the

State's earlier motion for a declaration of unitary status which was never ruled upon or granted.

*Liddell*, 1999 WL 33314210 at *1-2.

In accordance with the wishes of all concerned that decades of litigation might finally come to

an end, the court-approved Agreement contains strong release provisions limiting and foreclosing the

assertion of future lawsuits, especially against the County districts or VICC (the "New Entity").

Specifically, and apropos here, the Agreement provides that "the taking of any . . . action at any time

authorized in accordance with the rights and options granted in [the Agreement] shall not serve as the

---

[8] This affidavit is proffered in support of defendant's 12(b)(1) motion to dismiss for lack of
standing, and may properly be considered by the Court for this purpose. *Osborn v. United States*,
918 F.2d 724, 728 (8th Cir. 1990) (court may consider "matters outside the pleadings on a motion
. . . for dismissal under Rule 12(b)(1)").

6

basis for any claim or lawsuit against any County District or the New Entity," and that "the future continuation of any conduct, custom or practice permissible under the 1983 Settlement Agreement shall also not serve as the basis for any claim or lawsuit against any County District or the New Entity." SA p.47. VICC's continuation and extensions of the transfer program beyond the initial 10-year term are literally the exercise of "rights and options" that are "authorized" by the Agreement (SA p. 59 ¶8), and are also literally the "continuation of conduct, custom or practice permissible under the 1983 Settlement Agreement." Thus, pursuant to explicit court-approved and -incorporated release language, neither the eligibility requirements for the transfer program nor VICC's decisions to extend the transfer program may "serve as the basis for any claim or lawsuit against [VICC]."

### The Administration of County-to-City Magnet Transfers by VICC and the Separate Administration of Independent Charter Schools

As contemplated by the Agreement, VICC was established as the entity to administer the interdistrict transfer program. Glaser afft. ¶ 2. VICC's primary administrative responsibilities involve arranging for transportation of students participating in the City-to-County and County-to-City transfer programs authorized by the Agreement and acting as an agent for purpose of distributing funding to the school districts educating those students. *Id*. ¶ 3. As a service to the community, VICC disseminates information and policies regarding the eligibility standards for the transfer program. *Id*. ¶ 4. The information and policies do not purport to change the requirements of the Agreement, nor could they. *Id*.

Although VICC does play a role in the administration of County-to-City magnet transfers, it plays no role with respect to charter schools. *Id*. at ¶¶ 5-7. Charter schools are created by Missouri statute, R.S. Mo. §§ 160.400-160.425, as "independent public school[s]." R.S. Mo. § 160.400.1. They may be sponsored by school districts or institutions of higher education, and are organized by a "person, group or organization seeking to establish a charter school." R.S. Mo. § 160.405.1. VICC is

7

not involved in sponsoring or establishing any charter schools and plays no role with respect to the administration of, transportation to or funding of such schools. Glaser afft. ¶ 7. Nor does it tell charter schools who they can and cannot admit (*id.*), which is governed by state statutes discussed at pages 13 to 15, below.

### Summary of What Is Alleged and Not Alleged in the Complaint

The core factual allegations of the complaint are as follows: plaintiff is the parent of a student currently attending Gateway, a charter school in the City of St. Louis. Complaint ¶¶ 23, 31. At the time plaintiff's son enrolled at Gateway, the family resided in the City of St. Louis. *Id.* ¶ 29. In March of this year, they moved to St. Louis County. *Id.* ¶ 33. Plaintiff wants her son to continue his enrollment at Gateway. *Id.* ¶ 35. However, the complaint alleges, "[w]hen she inquired into enrolling [her son] at Gateway in future years, she learned that he would be unable to attend because he is African-American" and "if [her son] were white, he could enroll at Gateway." *Id.* ¶¶ 35-36. The complaint does not allege how plaintiff "learned" the foregoing, but it does attach a one page "handout" that is alleged to contain Gateway's enrollment requirements. Complaint ¶ 28 & Ex. C.

The complaint also contains several allegations about VICC policies regarding the *Liddell* County-to-City magnet transfer program, which polices are alleged to create limitations on enrollment in St. Louis City magnet schools based on race. Complaint ¶ 8-10 & 22. But the complaint does not allege that plaintiff ever sought to have her son enroll in a *Liddell* magnet school. With regard to the *Liddell* litigation, the complaint briefly summarizes certain portions of the history of that case (*id.* ¶¶ 12-16), but does not allege that there was ever a declaration of unitary status in the case (nor could it).

## ARGUMENT

I.    **The complaint, for multiple reasons, fails to state a claim and cannot be amended to do so.**

      A.    **As a remedy for adjudicated violations of the Equal Protection Clause, the transfer program cannot be challenged as violative of that Clause absent a declaration of unitary status in *Liddell*; the complaint fails to allege such a declaration, nor could it.**

Under settled law, where, as here, there is a court-ordered, race-based program to remedy an adjudicated violation of the Equal Protection Clause, that program cannot be challenged on equal protection grounds unless and until there has been a clear declaration of unitary status. *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 245-246 (1991) (before a court-ordered school desegregation remedy may be "terminated or dissolved," the parties involved are "entitled to a rather precise statement" that the district has achieved "unitary status"); *Hampton v. Jefferson County Board of Education*, 72 F.Supp.2d 753, 770, 782 (1999) (holding that remedial race-based student assignments could continue; plaintiffs cannot challenge such assignments on equal protection grounds without "proof . . . of an absence of vestiges [of prior discrimination] to the extent practicable" and a finding of "unitary status").[9]

A declaration of unitary status to end a desegregation remedial program requires evidentiary proof that the school district has "eliminat[ed] to the greatest extent practicable the vestiges of its prior policy of segregation." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 716, 721 (2007) (internal quotes omitted). Once a district has "remedied the constitutional wrong" that gave rise to the program and has been declared to have "achieved unitary status" then, and only

---

[9] *See also Little Rock School Dist. v. Arkansas*, 664 F.3d 738, 757-58 (8th Cir. 2011) (reversing district court's termination of desegregation obligations where court had not properly followed steps to determine unitary status), citing *Liddell by Liddell v. Bd. of Educ. of the City of St. Louis*, 121 F.3d 1201, 1216 (8th Cir. 1997) and *Missouri v. Jenkins,* 515 U.S. 70, 100–02 (1995).

then, "must [a remedial race-based student assignment program] be justified on some other basis."[10]
*Id*. Before such a declaration, however, the remedy has not "terminated" in the eyes of the law and
the compelling governmental interest in remedying the effects of past intentional discrimination still
squarely applies, foreclosing any equal protection challenge, *Dowell*, 498 U.S. at 246; *Parents
Involved*, 551 U.S. 720-21, citing *Freeman v. Pitts,* 503 U.S. 467, 494 (1992); *Hampton*, 72
F.Supp.2d at 777; *see also Little Rock*, 664 F.3d at 757-58.

The law demands extraordinary clarity regarding the termination of desegregation remedial
programs — ambiguous or unclear statements in a prior order will not be interpreted to terminate
such programs. *Dowell* and *Hampton* both involved what were held to be ambiguous or unclear
statements by a trial court that the school district in question was "unitary." In *Hampton*, the order in
question, denominated as a "Final Judgment," declared that "implementation of [the] amended
desegregation order has produced a unitary school system in Jefferson County, Kentucky." 72 F.
Supp. 2d at 765. In *Dowell* it was an "Order Terminating the Case," which expressly stated that
"[j]urisdiction in this case is terminated[.]" 498 U.S. at 241. In each case, however, even these
seemingly definitive statements describing the school district in question as unitary or the remedy
concluded were held to be too "unclear" or "[]ambiguous" to treat the race-based remedial programs
in question as terminated for purposes of allowing equal protection challenges. *See Dowell*, 498 U.S.
at 246 (holding program was not terminated because prior order was "unclear with respect to what it
meant by unitary and the necessary result of that finding"); *Hampton*, 72 F. Supp. 2d at 777 ("[t]he
Board and the community are entitled to an unambiguous statement" that the program is to end;
finding none in the prior rulings in the case, the court granted threshold dismissal of suit challenging

---

[10] In Plaintiff's Memorandum in Support of Preliminary Injunction (p.7), plaintiff inaccurately
paraphrases this quote from *Parents Involved* by omitting the language requiring that there be
"unitary status." Defendant further addresses this and other points in plaintiff's motion for
preliminary injunction in its separate brief in opposition to that motion, filed herewith.

remedial race-based student assignments).

In *Liddell* there has never been a declaration of unitary status, and plaintiff does not allege

otherwise. There has not even been an *ambiguous* declaration of unitary status as occurred in *Dowell*

and *Hampton*. Judge Limbaugh's 1999 Order did dissolve prior injunctions, but it replaced them by

approving and "incorporat[ing]" the Agreement, which by its terms was a "substitute for . . . all

substantive remedial obligations" in the case. *Liddell*, 1999 WL 33314210, at *9. The 1999 Order

nowhere even mentions "the vestiges of [the] prior policy of segregation," let alone find that they

have been "eliminat[ed] to the greatest extent practicable." *Parents Involved*, 551 U.S. at 716, 721

(internal quotes omitted). Nor does the Order make any statement that the remedy was concluded or

must terminate. To the contrary, the Agreement was expressly "approved as a remedy." *See* pp. 2-4,

above. As a matter of the express, unequivocal holdings of this Court, the County-to-City magnet

program is thus unquestionably a continuing remedial program for adjudicated violations of the

Equal Protection Clause. This is the antithesis of a remedy obviated by the achievement of unitary

status. Unless and until there are unambiguously clear findings of such status and of the requisite

eradication of all vestiges, the transfer program may continue as a matter of settled law without risk

of violating the Equal Protection Clause.

**B.    The transfer program eligibility requirements were expressly approved as constitutional by the Eighth Circuit and judgments of this Court; plaintiff's lawsuit is thus also an impermissible collateral attack, and is barred by judgment preclusion and binding precedent.**

Plaintiff's lawsuit is a blatant collateral attack on Judge Limbaugh's "final judgment"

approving (and incorporating) the provisions of the Agreement as "constitutionally permissible."

*Liddell*, 1999 WL 33314210, at *8-9. It is an equally frontal assault on the Eighth Circuit's *en banc*

holdings that the "utility and propriety of magnets as a desegregation remedy is beyond dispute" and

that the transfer program "compl[ies] with constitutional standards." *Liddell VII*, 731 F.2d at 1305,

1308, 1310. As a judgment approving settlement in a school desegregation class action, Judge

Limbaugh's decision is entitled to especially strong preclusive force. *See*, *e.g.*, *Garcia v. Board of*

*Education*, 573 F.2d 676, 679 (10th Cir. 1978) (principles supporting preclusive effect of judgments

and prohibiting collateral attacks are "particularly compelling" with respect to court-approved class-

action settlements in school desegregation cases). *Liddell VII* likewise constitutes binding precedent,

perfectly on point as a matter of both fact and law, specifically affirming the constitutionality of the

County-to-City magnet transfer program, and also affirming the earlier judgment of this Court —

itself entitled to preclusive and binding effect — approving the 1983 Settlement Agreement that first

established the County-to-City magnet transfer program. Plaintiff's complaint is barred as a matter of

law by these multiple prior adjudications of exactly the same issue presented here — whether the

transfer program is "constitutional" (it is) — and must be dismissed for this further reason.

### C.   Plaintiff's lawsuit is also barred by explicit release provisions in the 1999 Settlement Agreement approved by this Court.

Plaintiff's lawsuit is also barred by the express release provisions of the Agreement. The

Agreement was adopted by this Court as a way to *end* litigation, at least regarding the transfer

program. To accomplish this, the Agreement specifically provides that "the taking of any . . . action

at any time authorized in accordance with the rights and options granted in [this Agreement] shall not

serve as the basis for any claim or lawsuit against any County District or the New Entity," and further

provides that "the future continuation of any conduct, custom or practice permissible under the 1983

Settlement Agreement shall also not serve as the basis for any claim or lawsuit against any County

District or the New Entity." SA p.47. These binding remedial limitations and releases were approved

and incorporated by this Court's order and final judgment. *Liddell*, 1999 WL 33314210, at *9.

The eligibility requirements for County-to-City magnet transfers are unquestionably

"permissible under the 1983 Settlement Agreement" (the current eligibility requirements are identical

12

to those in the 1983 Settlement Agreement) and therefore cannot "serve as the basis for any claim or lawsuit" against VICC. *See* SA p. 57 ¶ 4; 1983 Settlement Agreement p.II-9 ¶ C.1.a. Likewise, VICC's prerogative to extend the ten-year period for acceptance of new transfer students (SA p.59 ¶ 8) is among the "rights and options" that are "authorized" by the Agreement and, therefore, pursuant to the explicit release language, VICC's extensions and current continuation of the transfer program "shall not serve as the basis for any claim or lawsuit against [VICC]." *Id.* p.47.

For these further reasons, based on literally applicable court-approved and -incorporated release language in the Agreement, this lawsuit should never have been brought and may not proceed.

## II.   Plaintiff lacks standing for multiple reasons.

To have Article III standing, a plaintiff must show (1) "an injury in fact"; (2) "causation — a fairly traceable connection between the plaintiff's injury and the complained of  conduct of the defendant"; and (3) "redressability — a likelihood that the requested relief will redress the alleged injury." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2012). Traceability is established if it is "likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 154 (4th Cir.2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also Miller*, 688 F.3d at 935. An injury is redressable if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000). Article III's standing requirements prohibit federal courts from issuing advisory opinions. *Pub. Water Supply Dist. No. 8 of Clay Cty., Mo. v. City of Kearney, Mo.*, 401 F.3d 930, 933 (8th Cir. 2005).  The party invoking federal jurisdiction bears the burden of establishing standing by a preponderance to the evidence.

*Miller*, 688 F.3d at 934; *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231 (1990).[11]

Plaintiff in this case lacks standing for multiple reasons.

**A.    The decision-maker regarding enrollment of plaintiff's son was not VICC, but Gateway; there is therefore no present case or controversy between plaintiff and VICC, nor was plaintiff's injury caused by or "traceable to" VICC.**

Plaintiff would like her son to attend Gateway, a charter school. But VICC plays no role with respect to administration or admission at Gateway, or any other charter school for that matter (*see* pp. 7-8, above). VICC's sole involvement with schools in the City is limited to *Liddell* magnet schools pursuant to the Agreement's County-to-City magnet transfer provisions. *Id*. The complaint attaches a one page "handout explaining the enrollment requirements at Gateway," but does not allege that that document was prepared by VICC (nor was it). Complaint ¶ 28; Glaser afft. ¶ 11. Charter schools are independent and make their own enrollment decisions. R.S. Mo. §§ 160.400.1, 160.410. The complaint does not even clearly state that Gateway has *even made* such a decision, or what the grounds for any such decision were.

Plaintiff also does not state whether she asked Gateway for a waiver of the school residency requirement as authorized by R.S. Mo. § 167.020.2(2). Such a waiver may be granted on the "basis of hardship or good cause." R.S. Mo. § 167.020.3. We are not in a position to judge whether such a waiver should be granted but, based on the allegations in the complaint, it certainly seems that plaintiff's son might be an ideal candidate for a waiver of the residency requirement.

---

[11] *See also Pharm. Care Mgmt. Ass'n v. Gerhart*, No. 4:14-CV-000345, 2015 WL 6164444, at *2 (S.D. Iowa Feb. 18, 2015) ("When a party brings a factual attack on a plaintiff's standing, the burden is on the plaintiff to demonstrate standing, and the court will not assume the pleadings are true with respect to Plaintiff's standing."); *Mulligan v. Huber*, No. 7:05CV5005, 2006 WL 994575 at *5 (D. Neb. April 10, 2006) ("[T]he court and the parties are *not* limited under Rule 12(b)(1) to the words of a complaint. A district court has the authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1) and, if it does, disputed issues of material fact will *not* prevent the court from deciding for itself the merits of jurisdictional claims.") (emphasis original).

14

In addition, as a charter school, Gateway is under a statutory obligation "not [to] limit admission based on race." R.S. Mo. § 160.410.3. Gateway's "handout" would appear to be contrary to that statutory requirement. Plaintiff suggests, although this too is not pled, that Gateway's handout is based on another portion of that same statutory section, § 160.410.1(2), which allows charters to admit students eligible to attend a district under an urban voluntary transfer program. But plaintiff fails to explain how Gateway reconciled these two statutory provisions which, in the circumstances of this case, might potentially be in conflict. There at least appears to be an issue whether Gateway has the legal right to deny admission to plaintiff's son as a matter of Missouri statutory law — but that is a question that is not properly presented or litigable in this case against VICC, which is not a charter school and has nothing to do with them. It is also a question of state law, and which ought not be litigated for the first time in federal court.[12]

As a result of plaintiff's less than fully candid allegations, which fail to show whether plaintiff has even *raised* the pertinent issues with the decision-maker, Gateway, there is no sufficiently pled causal connection to be made between plaintiff's alleged injury and anything done by VICC.[13] Plaintiff's complaint fails to show that her alleged injury is the result of the conduct of *VICC* (which has nothing to do with charters) as opposed to that of a third party (which *is* the charter school of

---

[12] In reconciling these two potentially conflicting statutes, a state court properly presented with the issue would be perfectly entitled to take into consideration the possibility of constitutional questions that may arise if the statutes are interpreted to deny plaintiff's son admission, and could interpret the statutes to avoid such issues. *See In the Interest of M.D.R.*, 124 S.W.3d 469, 472 (Mo. banc 2004) (construing a statute "to avoid the constitutional challenge"); *McDonald v. McDonald*, 766 S.W.2d 715, 720 (Mo. App. E.D. 1989) ("Statutes should be construed to avoid constitutional confrontations."). Whether based on these principles or otherwise, the state courts are best equipped to interpret and reconcile potentially conflicting state statutes in the first instance, and principles of comity warrant allowing them that opportunity.

[13] *See Scott v. Pasadena Unified School Dist.*, 306 F.3d 646, 653, 661 (9th Cir. 2002) (the "mere existence of [a race-based] admissions policy" is not sufficient to show standing where there is no proof that the "offending policy has ever been applied" to plaintiff). It is plaintiff's burden to show that *VICC*'s magnet transfer policy applies to plaintiff, which she does not and cannot do.

15

plaintiff's choice). Thus, as a matter of Article III jurisdiction, there is no sufficiently pled present

case or controversy to litigate between plaintiff and VICC.  *Lujan*, 504 U.S. at 560-61 ("there must

be a causal connection between the injury and the conduct complained of" — the injury has to be

"fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the

independent action of some third party not before the court"); *Miller*, 688 F.3d at 936 ("[w]hen the

injury alleged is the result of actions by some third party, not the defendant, the plaintiff cannot

satisfy the causation element of the standing inquiry"; plaintiff's "fail[ure] to include any allegations

regarding [a third party's] prominent role" it is "fatal for purposes of Article III"); *Doe v. Virginia

Dep't of State Police*, 713 F.3d 745, 755-56 (4th Cir. 2013) (standing "become[s] problematic when

third persons not party to the litigation must act in order for an injury to arise or be cured."); *Friends

of the Earth, Inc.,* 204 F.3d at 154 (plaintiff must show that it is "likely that the injury was caused by

the conduct complained of and not by the independent action of some third party not before the

court"). The complaint must therefore be dismissed as a matter of law for lack of standing on this

first ground.

> **B.**    **The relief plaintiff seeks cannot "redress" her alleged injury because her alleged
> injury stems from the *Liddell* eligibility requirements, not from action by VICC.**

As noted, Article III standing further requires that plaintiff's injury be "redressable," which

means, among other things, that the named defendant must have the power to remedy the alleged

injury. *See Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010) (dismissing for lack of

standing complaint seeking to enjoin Chief Justice Roberts from using the words "So help me God"

in the presidential oath; plaintiff's alleged injury lacked redressability because "the Chief Justice has

no legal authority or duty to decide what may be added to the presidential oath"); *Menifee v. McVey*,

2009 WL 413773, *2 (W.D. Pa. 2009) (dismissing for lack of standing on the ground of

redressability; defendant, a governmental entity, "d[id] not have the power to grant[ or] establish" the

relief requested); *Decker v. McDonald*, 2010 WL 1424322, *8 (E.D. Tex. 2010) (no standing because alleged injury was not redressible in action against these defendants; "[p]laintiff has not shown that any of them, in their official capacities, have the authority . . . to provide the kind of injunctive relief that he has requested.").

The eligibility requirements for County-to-City transfer are contained in the court-approved 1999 Settlement Agreement. SA p.57 ¶ 4. The Settlement Agreement authorized the creation of VICC (referred to as the "New Entity"). *Id.* ¶ 2, p. 56. VICC did not create the Settlement Agreement; the Settlement Agreement created VICC. *Id.* VICC's policies that plaintiff challenges are simply descriptions of the eligibility requirements in the Settlement Agreement. Glaser afft. ¶ 4. VICC has no "legal authority"[14] to alter the eligibility requirements and plaintiff's alleged injury is therefore not "redressable" in this action against it. *See Newdows* and other authority above.

### C. Plaintiff's challenge to VICC's extension of the transfer program, even if successful, would not redress her claimed injury in any event, further foreclosing her standing.

Plaintiff's complaint focuses on the *duration* of the County-to-City magnet transfer program as if the length of the program had some bearing on the relief she seeks. But in fact there is no connection. So, for example, plaintiff's complaint refers to the decisions to extend the transfer program for a period of years, as authorized by the *Liddell* Agreement. Complaint ¶ 21; SA p.59 ¶ 8. Those decisions, though, have no analytical nexus to the relief plaintiff seeks in this case. If VICC had never extended the transfer program, plaintiff's position would be exactly the same as it is now because *no* students, including plaintiff's son, would be eligible for transfer under the "urban voluntary transfer program" administered by VICC.

Likewise, even if there were now to be a declaration of "unitary status" in *Liddell*, the only

---

[14] Any amendment to the eligibility requirements would require the unanimous written consent of numerous independent entities. SA p.57 ¶ 4, p.67 ¶ 28.

result would be for the program to end, again in no way aiding plaintiff's cause. In fact, because any ending of the program must recognize the strong reliance interests of existing transfer students and their families to complete their education through high school (*see* SA p.59 ¶ 9), and as a matter of responsible educational practice must also make arrangements to permit the admission of siblings for families already in the program (Glaser afft. ¶ 9), the result of such a declaration would simply be that VICC would only need to begin an orderly and non-disruptive phase-out of the program. *Freeman v. Pitts*, 503 U.S. 467, 490 (1992) (courts must provide "orderly means" for termination of desegregation remedies). But VICC has *already* begun such a phase-out, and in fact is well into the process of completing it. Glaser afft. ¶¶ 8-10. Even a declaration of unitary status would thus result in *no change* to the current trajectory of the program. In any event, none of this would result in plaintiff's admission to Gateway.

In Article III terms, an order from this Court determining that the complained-of extensions were somehow improper or unlawful, or that the transfer program must end, could not "redress" plaintiff's alleged injury because her son would have no stronger basis to enroll in Gateway after such an order than he has now. *See Friends of the Earth, Inc.,* 528 U.S. at 181 (plaintiff must show "that the injury will be redressed by a favorable decision"). Plaintiff lacks standing for this additional reason, further warranting dismissal.

**D.     As a matter of sound jurisprudence, the Court need not and should not delve into questions of constitutionality where statutory interpretation and the actions of third parties may redress plaintiff's claimed injury.**

"If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 343-44 (1999). "It is a fundamental and long-standing principle of judicial restraint that courts avoid reaching constitutional questions if it is unnecessary to reach them." *United States v. One Parcel of*

*Prop. Located at RR 2, Indep., Buchanan Cty. Iowa*, 959 F.2d 101, 103 (8th Cir. 1992); *see also In re United Missouri Bank of Kansas City, N.A.*, 901 F.2d 1449, 1456-57 (8th Cir. 1990) (courts should avoid a constitutional question if there is a "reasonable alternative [that] poses no constitutional question"); *Chavez-Castillo v. Holder*, 771 F.3d 1081, 1085 (8th Cir. 2014) ("We need not reach these constitutional questions [raised by defendant] because they are not necessary to resolving this case.").[15]

Plaintiff has postured this case as a constitutional clash between the Equal Protection Clause and the Eighth Circuit's desegregation remedial jurisprudence implementing *Brown v. Board*, 349 U.S. 294 (1955) (requiring disestablishment of dual school systems). In reality, plaintiff's son may well be protected by a direct statutory command to charter schools "not [to] limit admission based on race" (§ 160.410.3) which, for reasons plaintiff has not explained, she has apparently chosen not to invoke, and may also have other remedies as well, including a residency waiver under § 167.020.2(2).

It is absolutely inappropriate to revisit highly-charged constitutional issues — issues that have been litigated to conclusion by dozens of parties over many years — while basic threshold legal and factual issues about plaintiff's *statutory* rights to enroll (or seek enrollment) at Gateway remain unresolved. Indeed, the not-so-subtle implication of plaintiff's arguments is that the voluntary interdistrict transfer program administered by VICC, one of the most successful of its kind in the

---

[15] This principle of judicial restraint is properly raised as a matter of prudential standing or ripeness. *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002) (holding, in case involving race-based admissions standards, that even if plaintiff could show injury-in-fact standing, case would be properly dismissed  on prudential grounds; "prudential considerations" are particularly significant "where constitutional issues" are raised); *Oti Kaga, Inc. v. S. Dakota Hous. Dev. Auth.*, 342 F.3d 871, 880 (8th Cir. 2003) ("[T]he judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to litigants best suited to assert a particular claim.") (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100 (1979)).

Nation, should abruptly end, interrupting the educations of current students and causing disruptions to schools throughout the City and County. There is simply no sound reason to attempt to disrupt this successful program, now in the process of winding down, over an issue that can conceivably be resolved by Gateway under the waiver provisions of § 167.020 or, failing that, by applying the literal language of the charter school admission statute to prohibit the refusal to admit plaintiff's son. As a matter of sound jurisprudential principle, this Court should decline to address the constitutional issues on which plaintiff's complaint is predicated and dismiss her complaint for lack of standing for this fourth independently sufficient reason.

## Conclusion

The *Liddell* County-to-City magnet transfer program administered by VICC is unquestionably constitutional and is not subject to challenge under the Equal Protection Clause. Plaintiff, in any event, has no standing to sue VICC, which has nothing to do with the charter school she wants her son to attend. For these and other reasons, set forth above, plaintiff's complaint must be dismissed at the threshold as a matter of law.

Respectfully submitted,

SHANDS, ELBERT,
 GIANOULAKIS & GILJUM, LLP

*/s/Mark J. Bremer*
Mark J. Bremer #24696MO
D. Leo Human #59787MO
1 North Brentwood Blvd., Suite 800
St. Louis, Missouri 63101
(314) 241-3963
(314) 241-2409 – fax
mbremer@shandselbert.com
lhuman@shandselbert.com

Attorneys for Voluntary
Interdistrict Choice Corporation

## <u>Certificate of Service</u>

The undersigned hereby certifies that on June 2, 2016, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: Joshua P. Thompson and Wencong Fa, Pacific Legal Foundation, 930 G Street, Sacramento, California 95814.

<i>/s/Mark J. Bremer</i>_____