UNITED STATES DISTRICT CORT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| E.L., a minor, by LA'SHIEKA WHITE the Mother, legal guardian, and next friend of E.L., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Cause No. 4:16-cv-629 RLW |
| VOLUNTARY INTERDISTRICT CHOICE CORPORATION, | ) ) ) ) |
| Defendant. | ) |

**REPLY MEMORANDUM IN SUPPORT OF THE VOLUNTARY
INTERDISTRICT CHOICE CORPORATION'S MOTION TO DISMISS**

SHANDS, ELBERT,
 GIANOULAKIS & GILJUM, LLP

Mark J. Bremer #24696MO
D. Leo Human #59787MO
1 North Brentwood Blvd., Suite 800
St. Louis, Missouri 63101
(314) 241-3963
(314) 241-2409 – fax
mbremer@shandselbert.com
lhuman@shandselbert.com

Attorneys for Voluntary
Interdistrict Choice Corporation

**Table of Contents**

Introduction ........................................................................................................................................1

ARGUMENT .....................................................................................................................................2

I.   Plaintiff's opposition removes all doubt that she does not and cannot state a claim, and this is so for three distinct reasons. ................................................................................................2

   A.   Plaintiff's brief fails to cite a single case undercutting the well-settled rule that where, as here, a race-based student assignment program is a court-approved remedy for an adjudicated *de jure* violation of the Equal Protection Clause in a contested school segregation class action, and there is no subsequent adjudication that all vestiges of the violation have been eradicated and unitary status achieved, the program cannot be challenged as violative of that Clause. .................2

   B.   Plaintiff's own cited cases confirm that she is bound by the class-action *res judicata* and collateral estoppel effects of the rulings in *Liddell*, which bar her claim. ......................................................................................................................7

   C.   Plaintiff's claim is also barred by the release provisions in the court-approved 1999 Settlement Agreement, which specifically foreclose *this* very kind of lawsuit against *this* defendant, and to which her brief has no answer. ...............................9

II.  Plaintiff's brief confirms and confesses her lack of standing. ......................................................10

Conclusion .......................................................................................................................................15

**Introduction**

Plaintiff's brief opposing dismissal confirms that she has no proper legal basis to bring this action. The *Liddell* transfer program exists as a remedy for the City district's and State's adjudicated constitutional violation in establishing and maintaining a system of *de jure* school segregation in the City of St. Louis. Both the existence of this constitutional violation and the constitutionality of the remedy for it were adjudicated by the Eighth Circuit *en banc*. Not one case relied on by plaintiff involves a situation remotely like this one. Plaintiff's cases involving workplace affirmative action consent decrees entered without any judicial finding of statutory or constitutional violation are fundamentally inapposite. Plaintiff's extraordinary new contention — made in a desperate attempt to save her claim — that the *Liddell* transfer program has been unconstitutional *from its inception* (in the early 1980s) is legally baseless. Her efforts to avoid the claim-barring effects of prior decisions of the Eighth Circuit and this Court (and of the court-approved release provisions) are similarly baseless and only further confirm that the action must be dismissed.

Plaintiff's brief also confirms her fatal lack of standing. The charter school plaintiff would like her son to attend, Gateway Science Academy, has discretion to admit her son. It is also under a statutory obligation "not [to] limit admission based on race." R.S. Mo. § 160.410.3. VICC has nothing to do with charter schools; it is only involved with magnet schools. Plaintiff's response to these indisputable points — which utterly sever any connection between this lawsuit and her claimed injury — is to ignore them and, instead, switch theories, now claiming that she wants her son to attend magnet schools. This new theory is not only unpled, it is directly contrary to both her complaint and the factual record in this case. Plaintiff's last minute attempt to switch theories, and her lack of response to multiple dispositive standing arguments defeating her original Gateway claim, amount to a confession that she lacks standing. Her claim must be dismissed at the threshold for this reason as well.

## ARGUMENT

**I.   Plaintiff's opposition removes all doubt that she does not and cannot state a claim, and this is so for three distinct reasons.**

   **A.   Plaintiff's brief fails to cite a single case undercutting the well-settled rule that where, as here, a race-based student assignment program is a court-approved remedy for an adjudicated *de jure* violation of the Equal Protection Clause in a contested school segregation class action, and there is no subsequent adjudication that all vestiges of the violation have been eradicated and unitary status achieved, the program cannot be challenged as violative of that Clause.**

None of the cases cited by plaintiff to save her claim involved a challenge to a court-imposed remedy for an adjudicated violation of the Equal Protection Clause in a contested *de jure* school segregation class action. Plaintiff primarily relies on cases involving "consent decrees" adopted to address claims of or concerns about employment discrimination that were never adjudicated or proven to a court.[1] Others are even more off-point, or actually favor VICC.[2] Just two of the cases

---

[1] The following cases cited by plaintiff involved the inapposite scenario of a consent decree adopted to govern employment discrimination or create an affirmative action plan without any adjudication of wrongdoing, and are otherwise analytically distinguishable as noted in parentheticals: *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 526 (1986) (decision was on a direct appeal, not an attempted collateral attack); *Donaghy v. City of Omaha*, 933 F.2d 1448, 1459 (8th Cir. 1991) (no class action; consent decree upheld; court expressly distinguished cases where "a court has [made] a formal finding of intentional discrimination"); *Vogel v. City of Cincinnati*, 959 F.2d 594, 599 (6th Cir. 1992) (Title VII consent decree; not a class action); *U.S. v. Brennan*, 650 F.3d 65 (2nd Cir. 2011) (consent decree arose from Title VII disparate impact claim); *Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006) (no class action; upholds consent decree); *Martinez v. City of St. Louis*, 327 F. Supp. 2d 1002, 1010 (E.D. Mo. 2003) (Title VII disparate impact case; not a class action); *In re Birmingham Reverse Discrimination Emp't Litig.*, 20 F.3d 1525 (11th Cir. 1994); *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 227 (6th Cir. 1993) (voluntarily adopted affirmative action employment policy not entered or decreed by court); *Martin v. Wilks*, 490 U.S. 755 (1989) (Title VII case; holding superseded by statute as noted by *Landgraf v. USI Film Products*, 511 U.S. 244, 251 (1994)).

[2] *U.S. v. Armour & Co.*, 402 U.S. 673 (1971) (alleged violation of a consent decree pertaining to meat packing; no statement that a violation had ever been adjudicated and no constitutional challenge); *Christina A. ex rel Jennifer A. v. Bloomberg*, 315 F.3d 990, 993 (8th Cir. 2003) (prison inmate lawsuit, settled without adjudication of violation); *U.S. v. Coffee Cty. Bd. of Educ.*, 134 F.R.D. 304, 308 (S.D. Ga. 1990) (declining to permit intervention to litigate terms of consent decree that had not yet been agreed to or adopted by the court); *Drinkwater v. Sch. Comm. of Boston*, 550 N.E.2d 385, 387 (1990) (employment case involving dispute over whether minority candidates were qualified; because plan was "incorporated in a court-ordered

2

cited by plaintiff even involve race-based student assignments in schools, and neither of those cases involved an adjudicated violation of the Equal Protection Clause (which exists here) or supports plaintiff's position in the slightest.[3]

As a matter of law, an adjudicated violation of the Equal Protection Clause — especially when the violation is *de jure* school segregation — justifies race-based remedial action, and such remedial measures are a well-settled "exception" to the general prohibition against race-based measures. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 737 (2007) ("[N]o one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies."), 749-50, 751-54 ("[T]his Court . . . require[s] race-based remedial measures to address *de jure* segregation"; cases involving "constitutionally compelled remediation in schools" are an "exception" to the general prohibition against racial classifications) (Thomas, J., concurring); *Vaughns v. Bd. of Educ. of Prince George's Cty.*, 742 F. Supp. 1275, 1295, 1298 (D. Md. 1990) (cited by plaintiff) (because actions were taken to "fulfill [defendant's] affirmative duty to eradicate the vestiges of discrimination, pursuant to orders of this Court," strict scrutiny is not "applicable"); *Hampton v. Jefferson Cty. Bd. of Educ.*, 72 F. Supp. 2d 753, 778, 782 (W.D. Ky.

---

desegregation plan[, t]here can be no doubt of the necessity for race-conscious relief," which corroborates VICC's position); *Mannings v. Sch. Bd. of Hillsborough Cty., Fla.*, 796 F. Supp. 1491, 1494 (M.D. Fla. 1992) (declining to enjoin state court proceedings because injunction was prohibited by the Anti-Injunction Act); *Hansberry v. Lee*, 311 U.S. 32 (1940) (injunction regarding land use; not a class action); *Allen v. Sch. Bd. for Santa Rosa Cty., Florida*, 787 F. Supp. 2d 1293, 1297-98 (N.D. Fla. 2011) (speech rights case; permitting action to determine proper interpretation of consent decree but not *per se* challenging it); *U.S. v. City of Chicago*, 897 F.2d 243 (7th 1990) (employment case denying challenge to consent decree; this case favors VICC, *see* p.8 n.10, below); *Vaughns v. Bd. of Educ. Of Prince George's Cnty.*, 742 F. Supp. 1275 (D. Md. 1990) (this case, which holds that a remedial program directed by a court for a constitutional violation is not subject to strict scrutiny, confirms that plaintiff's claim against VICC must be dismissed).

[3] *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701 (2007), and *Ho by Ho v. San Francisco Unified School Dist.*, 147 F.3d 854 (9th Cir. 1998). *Parents Involved* is discussed further in the following paragraph in the text. *Ho by Ho* is addressed at p.7 n.9, below.

3

1999) (in suit challenging racial composition guidelines and attendance zones implemented pursuant to a desegregation decree plaintiff must provide *inter alia* "proof of . . . an absence of vestiges to the extent practicable," i.e., "unitary status").[4]

Unlike in any of the cases cited by plaintiff, in *Liddell* both violation and remedy were hotly and at times bitterly contested, and were definitively adjudicated by the Eighth Circuit. In *Adams v. United States*, 620 F.2d 1277, 1288 (8th Cir. 1980), after trial and a contested appeal, the Eighth Circuit squarely held that the City district and State of Missouri failed to meet their "constitutional duty to disestablish the dual school system in the City of St. Louis." In *Liddell VII* the Eighth Circuit described the "scar[s]" that this constitutional wound inflicted on "five generations" of City students. *Liddell v. State of Missouri*, 731 F.2d 1295, 1308, 1313 (8th Cir. 1984) (en banc). The Eighth Circuit also devised and imposed the remedy for the City district's and the State's adjudicated violations. *Adams* ordered a lengthy list of race-conscious[5] remedies, and required the City district to ("shall") seek the cooperation of County districts in a plan of interdistrict transfers. 620 F.2d at 1297. The transfer program devised to comply with this mandatory directive was vigorously challenged on constitutional and other grounds by the State, and its propriety was adversarialy litigated and adjudicated *en banc* in *Liddell VII*. The Court emphasized and held that the transfer program was

---

[4] The scope and power of this "exception" is at its zenith in cases of adjudicated *de jure* school segregation, which address a unique and historic wrong for which the courts impose extraordinary and sweeping remedies. In this circumstance, the iron core of the federal courts' remedial equal protection jurisprudence, even Justices who have sought to cabin governmental use of race-conscious actions in other contexts acknowledge an exception to the ordinary rules of strict scrutiny. *See Parents Involved*, 551 U.S. at 750, 752-54 (Thomas, J., concurring); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 524 (1989) (Scalia, J., concurring, citing desegregation cases as example of the "only . . . circumstance in which the States may act *by race*") (emphasis original).

[5] In *Adams*, the City district and white City residents sought to defend the existing "[r]acially neutral" school assignments. 620 F.3d at 1286. The Eighth Circuit held this to be insufficient as a matter of law: "All things being equal, with no history of discrimination, it might well be desirable to [use a race neutral plan]. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation." *Id*.

4

both "necessary" and "compl[iant] with constitutional standards." 731 F.2d at 1297, 1305. It should also be noted that *Liddell VII* altered the proposed remedy in certain respects, including revising the eligibility requirements for magnet school transfers to eliminate County-to-County transfers, and explicitly specifying that "[t]o be eligible for transfer, students . . . must be in the racial majority in their home districts." *Id*. at 1302. These essential, contested and adjudicated determinations by the Eighth Circuit — of both constitutional *wrong* and constitutionally required *remedy* — were never altered or disturbed by any subsequent litigation or settlements in the *Liddell* case. The 1999 Settlement Agreement's race-based eligibility requirements were expressly an adoption and continuation of the very ones previously adopted, approved and directed in *Liddell VII*. SA p.57 ¶ 4. The *Liddell* remedies, including the transfer program, are thus a quintessentially direct application of the "exception[al]" remedial powers that apply in Equal Protection Clause school desegregation cases, and accordingly may not be challenged on equal protection grounds. *See* preceding paragraph.[6]

Plaintiff does not allege that there has ever been a declaration of unitary status in *Liddell* nor does she cite any judicial pronouncement ending the *Liddell* remedies, because none were ever made.[7] And plaintiff does not, nor could she, request such judicial determinations in this case where

---

[6] *See also Vaughns*, 742 F. Supp. at 1296-97 (cited by plaintiff) (strict scrutiny did not apply in part because "in this litigation this Court does not deal with a plan independently and voluntarily conceived and executed by a school board . . .. Rather, there exists a court-ordered plan").

[7] Neither the words "unitary status" nor the substantive requirements behind those words — a finding the school district has "eliminat[ed] 'to the greatest extent practicable the vestiges of its prior policy of segregation'" and a "precise statement" that the remedy is to end (*Parents Involved*, 551 U.S. at 716, 721; *Bd. of Ed. of Oklahoma City v. Dowell*, 498 U.S. 237, 245-246 (1991)) — have ever been mentioned, let alone adjudicated, in *Liddell*. Plaintiff suggests Judge Limbaugh's 1999 decision contained such a "precise statement" (plaintiff's memorandum opposing this motion, Doc. 22 ("plaintiff's opp.") p. 4 n.3), citing the reference to "dissolving" prior injunctions in the case. But plaintiff's argument that "dissolving" a prior decree is tantamount to unitary status is based on a blatant misquotation of the Supreme Court's opinion in *Parents Involved* and is utterly invalid. *See* VICC memorandum opposing preliminary injunction, Doc. 21, p.3. In any event, in the next breath after "dissolving" the prior injunctions Judge Limbaugh's order adopted

5

neither the adjudicated violators nor the plaintiffs who proved the violation are present. This case simply must therefore be dismissed, without more.

The foregoing case law and analysis also conclusively refute plaintiff's contention that VICC somehow has a "burden" to prove "narrow tailoring" to justify the race-based transfer program. Plaintiff's opp. 7. It also refutes her even more extraordinary (and undisguisedly desperate) contention that the *Liddell* plaintiffs themselves never met their burden to prove "narrow tailoring," and that the *Liddell* race-based remedies have therefore been invalid and unconstitutional *from their inception in the early 1980s*. *Id.* (stating that the transfer program has been unlawfully "discriminat[ory]" for 30-plus years and questioning whether the program "ever was" constitutionally necessary). Plaintiff's position stands the foregoing well-settled desegregation jurisprudence on its head. Race-based remedies for unconstitutional school segregation are not only themselves constitutional — as every judge, Justice and court opining on the issue has said — they are also typically absolutely essential and necessary, as the Eighth Circuit squarely held in *Liddell*. Whether viewed as a remedial "exception" to the general prohibition against race-based measures or as automatically and implicitly compliant with modern notions of "narrow tailoring,"[8] such race-based remedies require no further justification to survive an equal protection challenge. Under settled desegregation jurisprudence, the *burden is on plaintiff* to show either that there never was an

---

and "incorporated" the settlement-agreement "remedy" as a "substitute for" and "continuation of" previously ordered "remedial obligations." *Liddell v. Bd. of Ed. of City of St. Louis*, 1999 WL 33314210, *4, *9 (E.D. Mo. 1999); SA p.2.

[8] The Supreme Court's standards for remediation in such cases afford district courts exceptionally broad discretion and mandate that violators do whatever it takes to "eliminate [*de jure* school segregation] root and branch." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971); *Green v. Cty. Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 437-38 (1968). *Liddell VII* and this Court applied and complied with those standards. The remedies imposed address adjudicated Equal Protection violations and were necessary to achieve that compelling and urgent remedial purpose. *Green*, 391 U.S. at 439 (remedy must be a "plan that promises realistically to work, and promises realistically to work now").

adjudicated equal protection violation or that the vestiges of any such adjudicated violation were subsequently fully eradicated and unitary status declared.[9] Incapable of proving either in this case, plaintiff's complaint must be dismissed.

>   B.   **Plaintiff's own cited cases confirm that she is bound by the class-action *res judicata* and collateral estoppel effects of the rulings in *Liddell*, which bar her claim.**

Plaintiff's *only* response to the clear claim- and issue-preclusive effects of Judge Limbaugh's 1999 order and previous *Liddell* decisions, is to contend that she is not bound by those decisions because she was not a party in *Liddell* and her son was not yet born. Plaintiff's opp. 5. This contention reflects a misunderstanding of the preclusive effects of adjudications in a class action like *Liddell*. Indeed, the very cases plaintiff cites, *Hansberry*, 311 U.S. 32, and *Martin*, 490 U.S. 755, directly refute her position. *Hansberry* holds that "the judgment in a 'class' or 'representative' suit, to which some members of the class are parties, may bind members of the class or those represented who were not made parties to it." 311 U.S. at 41. *Martin* likewise expressly states that "'class' or 'representative'" suits are the "exception" to its holding. 490 U.S. at 762, n.2. Neither *Hansberry* nor

---

[9] *Hampton*, 72 F. Supp. 2d at 781 ("[T]he party seeking termination of the desegregation decree, 'bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation.'"), citing *Freeman v. Pitts*, 503 U.S. 467, 494 (1992). *Hampton*'s treatment of these issues was the underlying basis for the Supreme Court's opinion in *Parents Involved*, which praised the *Hampton* court for its "rigorous" process. *Parents Involved*, 551 U.S. at 736. *Ho by Ho*, which plaintiff extensively quotes and relies on, may very well have been correct in assigning the burden to the school district because, unlike here, there had never been an adjudication of violation in that case. *See San Francisco NAACP v. San Francisco Unified Sch. Dist*, 413 F. Supp. 2d 1051, 1054 (N.D. Cal. 2005) (successor case to *Ho*, noting that consent decree was entered before trial). Plaintiff is also incorrect when she invokes *Ho by Ho* as authority for her view that she can proceed in this case against VICC alone without the elimination of vestiges of prior segregation having been established. In *Ho by Ho* the court returned the matter to the district court for a trial regarding the existence of such "vestiges," in which the alleged violator the (San Francisco schools) was to participate. 147 F.3d at 865. *Ho by Ho* thus actually *refutes* plaintiff's argument that she can challenge a desegregation program in a suit brought solely against a non-party to the desegregation case (VICC). Ultimately, the matter was merged into the main desegregation case and the result was a court-approved phase out over approximately seven years. *San Francisco NAACP*, 413 F. Supp. 2d 1054.

7

*Martin* was a class action or involved school desegregation.

*Liddell*, of course, is a class-action desegregation lawsuit and, under settled law, its holdings are therefore binding on the entire class, including those "not born or not yet in school" at the time of the original decision. *See Bronson v. Bd. of Ed. of Sch. Dist. of City of Cincinnati*, 510 F. Supp. 1251, 1262 (S.D. Ohio 1980); *Dowell v. Bd. of Educ. of Oklahoma City Pub. Sch.*, 606 F. Supp. 1548, 1555 (W.D. Okla. 1985) (desegregation case rulings are binding on all individuals in the class even though "individual members of [the] class may have changed with the passage of time, [which] change cannot defeat the preclusive effect of [the] court's original [rulings]"), *reversed on other grounds*; *see also Los Angeles Unified Sch. Dist. v. Los Angeles Branch NAACP*, 714 F.2d 935, 941 (9th Cir. 1983); *Coates v. Kelley*, 957 F. Supp. 1080, 1085-86 (E.D. Ark. 1997); *Snell v. Allianz Life Ins. Co. of N. Am.*, No. CIV. 97-2784 JRT/AJB, 2010 WL 5422593, at *4 (D. Minn. Oct. 13, 2010).[10]

Unable to cite even a single case challenging the strong preclusive effect of the *Liddell* class-

---

[10] The issues plaintiff challenges in this case — the constitutionality of the transfer program and its eligibility requirements — were the subject of central, explicit holdings in Judge Limbaugh's 1999 order, *Liddell VII* and *Adams*, and are therefore unquestionably barred by both collateral estoppel and *res judicata*. *Bauer v. Transitional Sch. Dist. of City of St. Louis*, 255 F.3d 478, 482 (8th Cir. 2001), cited by plaintiff, does not alter this conclusion. *Bauer* merely held that a speculative state-law conflict with unspecified portions of the *Liddell* settlement failed to create federal appellate jurisdiction under a very specialized statute applicable to "federal officers" who are "executing duties" under "federal civil rights statutes." The case had nothing to do with the school desegregation jurisprudence that governs *Liddell* and the claims in this case, or with the preclusive effect of adjudications in *Liddell*. The court also expressly distinguished suits that "directly attack the *Liddell* settlement," which plaintiff's complaint does here. *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180 (8th Cir.1984), is cited by plaintiff for this point, but in that case, as in *Hansberry* and *Martin*, the court expressly distinguished class action lawsuits. *City of Chicago*, 897 F.2d at 244, also cited by plaintiff, is actually a perfect illustration of why this case should not proceed. In that case the court denied intervention to challenge aspects of the remedy that had previously been adjudicated because it "threaten[ed] to breathe life into a question (quotas) that has been resolved to the satisfaction of the original parties. . . . Litigation will have no end if every time the parties resolve amicably (or drop) a point of contention, someone else intervenes to keep the ball in the air."

8

action adjudications approving the transfer program as constitutional (*see* VICC's memorandum in support of this motion, Doc. 20 ("VICC br.") p. 11-12), plaintiff is bound by those rulings and her claim must be dismissed for this second reason.

      **C.**    **Plaintiff's claim is also barred by the release provisions in the court-approved 1999 Settlement Agreement, which specifically foreclose *this* very kind of lawsuit against *this* defendant, and to which her brief has no answer.**

Plaintiff has no answer to the claim-dispositive point that under the 1999 Settlement Agreement approved by this Court VICC (as the "New Entity") is explicitly and literally released and protected from suit on the very kind of claim plaintiff has asserted in this case (VICC br. 12-13), other than to reference a provision in another section of the Agreement. Plaintiff's opp. 6 n.4. That provision, however, does not mention the New Entity at all, has nothing to do with the New Entity, and says nothing about any claims against the New Entity. To the contrary, the provision merely says that if a third party challenges *the State's* and *City district's* (i.e., the adjudicated violators') performance under the Agreement as violative of the constitution or civil rights, "all parties[11] will defend the Agreement." SA p.45 ¶ 9. Nothing in that inapposite section and provision even remotely suggests that plaintiff at bar is authorized to sue *VICC*, or that the entirely separate provisions in another section (SA pp.46-47 ¶ 23(e)) — which explicitly and literally *bar* plaintiff from suing VICC — are not fully enforceable in accordance with their terms.

    Plaintiff's claims against VICC are unquestionably barred by the Agreement's court-approved release provisions — a point to which plaintiff has no cognizable response, as her brief now confirms — providing yet another independently sufficient reason why her complaint must be dismissed.

---

[11] The term "parties," it should be noted, is defined in the Agreement to include "signatories" *other than* the County districts (SA p.1) and also, obviously, excludes VICC (the New Entity), which was neither a "signatory" nor yet even in existence. This further confirms that the provision cited by plaintiff has absolutely no relevance to VICC or her suit against it.

9

## II.   Plaintiff's brief confirms and confesses her lack of standing.

VICC's motion to dismiss demonstrated that plaintiff lacked standing because she sought to enroll her son in a charter school and VICC has nothing to do with charter schools and is only involved with magnet schools. Plaintiff's response to this fatal standing defect is to switch the theory of her lawsuit. Her brief now says that she seeks admission for her son at some unspecified magnet school in the City. This new theory, the very assertion of which effectively confesses error in the filing of her suit against VICC, is nowhere pled in her complaint and must therefore be disregarded under the *Iqbal* pleading standard. Apart from being fatally unpled, the new theory is flatly foreclosed by what *is* pled.

Both in her complaint and her motion seeking a preliminary injunction, plaintiff's sole stated goal is to have her son attend Gateway. Declaration of La'Shieka White ("White decl.") (Doc. 10-2) ¶ 4 ("I want E.L. to remain at Gateway Science Academy and attend that school through at least the Fifth Grade."); Complaint ¶¶ 35, 39, 50, 52 (alleging that plaintiff sought admission to Gateway and citing only Gateway as the basis for her claims for relief), 24 (describing Gateway's "world class education"); Memorandum in Support of Motion for Preliminary Injunciton (Doc. 10-1) pp.2 (any school other than Gateway, with a "different curriculum," "new teachers and new friends," would "irreparabl[y] harm" plaintiff), 4 (describing Gateway as the "saving grace"), 9 (citing Gateway's racial diversity statistics), 10 (Gateway is the "only school" plaintiff has ever known); White decl. ¶¶ 7 & 9 (citing unique benefits of Gateway). Nowhere in her complaint or declarations does plaintiff express any interest at all in transfer to a magnet school.[12] Plaintiff's brief's further claim that her son has been "prevented from transferring to a magnet school" (plaintiff's opp. 1) is likewise unpled and completely outside the record. There is no allegation whatsoever that she sought

---

[12] None of the paragraphs of the complaint plaintiff cites on page 8 of her brief express any interest at all in transferring to a magnet school. At most, the cited paragraphs merely note the existence of the magnet program in passing to support her claim seeking admission *to Gateway*.

10

enrollment in a magnet school or to the magnet school transfer program, or that she ever intends to do so in the future. To the contrary, as the complaint does plead and as her declarations make clear, plaintiff is exclusively interested in enrolling her son at Gateway. In addition to being totally unpled, plaintiff's new magnet school theory, even if allowed, would itself fail as a matter of law to impart standing because plaintiff has not applied for that program or expressed any intention to do so. *See Our Schools-Southeast & Northeast v. District of Columbia Bd. of Ed.*, 564 F. Supp. 2d 1, 7 (D.D.C. 2008) (in challenge to charter school admission policy, plaintiffs who had not applied for admission lacked standing), citing *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Allen v. Wright*, 468 U.S. 737, 755 (1984); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166-67 (1972).[13] Plaintiff has the *burden* to show her standing both factually and on the face of her pleadings, but she has done neither. *Osborn v. United States*, 918 F.2d 724, 728 (8th Cir. 1990).[14]

Further confirming plaintiff's lack of standing is her brief's complete failure to provide any answer to (or even mention) the charter school statute's direct *command* that charter schools "shall not limit admission based on race." R.S. Mo. § 160.410.3; VICC br.15. This mandatory statutory directive, which is a part of the same charter school admission statute that is the entire basis for plaintiff's claim, completely undercuts the entire theory and purpose of her case. Her brief seems to assume that an interpretation of this statute to prevent Gateway from using race-based criteria in its

---

[13] Plaintiff cites *Patsy v. Bd. of Regents of the State of Fla.*, 457 U.S. 496, 498 (1982), for the contrary proposition, but the case is not helpful to her. *Patsy*, which did not involve standing, was an employment case where the plaintiff had in fact *applied for* the jobs (13 of them) she claimed she was discriminatorily denied.

[14] As *Osborne* explains, standing may be challenged both on Rule 12(b)(6) grounds and as a factual matter under 12(b)(1), and plaintiff must meet both burdens. Here, she has neither met the pleading burden (adjudged under *Iqbal*) nor shown standing factually (which this court judges on a preponderance of the evidence standard with the burden on plaintiff). *Osborne*, 918 F.2d at 728; *see also* VICC br. 6 n.8, 13-14 & n.11. Indeed, except for one cursory citation to the Settlement Agreement, she neither cites nor proffers any factual material in the record to support her standing in this case. Even apart from the lack of any pleading asserting plaintiff's new magnet school theory, this alone requires dismissal of her claim.

11

admissions would somehow be a change in Missouri law, but plaintiff has never shown that Missouri law, properly applied and interpreted, prevents her son from attending Gateway in the first place. All elements of plaintiff's standing in this case — injury, traceability, and redressability — utterly fail if, as we have no reason to believe otherwise, Gateway is required by Missouri statute to admit plaintiff's son. Yet plaintiff does not even acknowledge this statute's existence, much less provide any analysis how her claim can possibly continue to be prosecuted if this statute were to be simply applied as written.

Plaintiff also *concedes* that a third-party's "discretionary choice" can sever the chain of causation for standing purposes. Plaintiff's opp. 11. This admission is absolutely fatal to her claim because plaintiff cannot dispute that Gateway has discretion to admit her son under R.S. Mo. § 167.020(2) (the residency waiver provision). Plaintiff complains about the "rigmarole" of asking for a waiver but there is no rigmarole other than what Gateway — the third-party in possession of (at a minimum) "discretionary choice" — may choose to impose. The statute imposes no formal requirements upon plaintiff to obtain such a waiver other than to simply request one and show a hardship. There is no allegation here that plaintiff has even requested such a waiver, much less that the request was denied, nor is there anything else that could possibly reestablish the causal link admittedly severed by Gateway's "discretion[]."

Plaintiff's brief also fails to show how she can satisfy the redressability requirement, thus further foreclosing her standing. She cites case law purportedly authorizing the enjoining of a governmental entity from "enforcement" and "threatened enforcement" of the Agreement's provisions she challenges (plaintiff's opp. 13), but VICC does not "enforce" or "threaten" to enforce anything with respect to charter schools, nor does it have anything to do with charter schools (Glaser afft. ¶ 7). Plaintiff points to VICC's policies, but those policies, which merely recite the

eligibility terms required by the Agreement, are irrelevant. The charter school admission statute does not reference VICC's policies; it references "an urban voluntary school transfer program." By statute, the eligibility requirements for an "urban voluntary school transfer program" are "subject to a settlement incorporated into a final judgment" — *i.e.*, the *Liddell* Settlement Agreement. R.S. Mo. § 162.1060.2(1). That Agreement, moreover, cannot be altered by VICC (*see* VICC br. 16-17). VICC's removal of its policies from its website or even VICC's compliance with an order not to "enforce" them with respect to charter schools would accomplish nothing for plaintiff, because none of that would change the Agreement or the statutory reference to the Agreement, which alone control. Plaintiff's complaint is evasive as to whether *any* entity has acted to "enforce" the Agreement as to her, but if one did it would presumably have to be Gateway, and in any event not VICC.[15]

Plaintiff's brief now says that she would be perfectly satisfied if her lawsuit resulted in the immediate ending the VICC transfer program ("the withdrawal of benefits from the favored class") — as if that would somehow "redress" her alleged injury. Plaintiff's opp. 13. Apart from being unconnected to any possible educational relief for her son, which is plaintiff's professed purpose in bringing this lawsuit, this request is also completely ineffectual. Even if this Court were to "order"

---

[15] If plaintiff's enrollment application was denied by Gateway (a fact which is not pled), then that school would certainly have played a "prominent role" in plaintiff's alleged injury. Likewise, if plaintiff was injured as a result of the charter school admission statute, the State would have a similarly "prominent role." These circumstances alone show plaintiff's lack of standing to sue VICC. *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 936 (8th Cir. 2012); *see also* VICC br. 16, citing additional authority. Contrary to plaintiff's brief, *Miller* is in point. There, suit was filed against a testing lab because its test results had been used by the State of Minnesota to initiate probation actions against alcohol offenders. The suit was dismissed for lack of standing because plaintiff "fail[ed] to include any allegations regarding the State's prominent role" in his alleged injury. In precisely the same way, the *Liddell* desegregation remedial program has been referenced and incorporated by the State of Missouri into a statute, and that statute apparently may be being enforced by Gateway despite its discretion to reach another conclusion, yet plaintiff fails to include any allegations with regard to these other actors' "prominent role[s]" in her alleged injury. This is fatal to her standing to sue non-actor VICC.

13

the VICC program to end (which it cannot and should not do in this case), that ending could not occur immediately. The Court's legal obligation to provide an "orderly means" to end desegregation remedies (*Freeman*, 503 U.S. at 490), as well as its legal and moral obligation to protect the interests of current magnet transfer students and their families,[16] means that the ending of the program would necessarily be by means of a gradual phase-out — precisely what is already occurring without judicial intervention. Plaintiff accuses VICC of "threat[ening]" to end the program, but there is no threat of anything. Phase-out was contemplated by the Agreement from its inception, and has been occurring since then and will continue to do so, with or without plaintiff's lawsuit. SA pp.49, 58 ¶ 7, 59 ¶ 8; Glaser afft. ¶¶ 8-10.[17]

Contrary to plaintiff's claim, the Court also may, and in this case should, dismiss this case so that basic statutory questions under R.S. Mo. §§ 167.020 and 160.410 — questions which plaintiff manifestly has no interest in asking or analyzing — can be answered by a state court in a case where they will be properly litigated. *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002), illustrates exactly why this case must be dismissed. That case involved a challenge to a race-based school admission policy, but the challenge failed for lack of standing and ripeness because the

---

[16] *See, e.g., Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374 (1940) (court should protect those who reliantly "acted upon" the original decree); *Bradley v. School Bd. of City of Richmond*, 416 U.S. 696, 720 (1974) ("The Court has refused to apply an intervening change [of law] to a pending action where . . . to do so would infringe upon or deprive a person of a right that had matured or become unconditional"); *Rosebud Sioux Tribe v. State of South Dakota*, 900 F.2d 1164, 1173 (8th Cir. 1990) (change in decisional law will not be allowed to alter effect of prior court decisions if it "disturbs . . . vested rights [or] justifiable expectations"); *see also* SA p.60, ¶ 12 (student "tenure" provision).

[17] Plaintiff professes "confus[ion]" regarding how the race-based transfer program can phase-out if it is the result of a constitutional adjudication. Plaintiff's opp. 7. First, the program can phase-out because Judge Limbaugh held and ordered that it could. Second, the program can phase-out because the participating County district are "volunteers" assisting the adjudicated violators in their remediation, and they are not required to continue volunteering forever. *See* VICC br. 2 n.2. Third, the program can phase-out because the Supreme Court has made it clear desegregation remedial measures (in this case, from a peak of more than 14,000 transferring students) should be phased out in an orderly manner.

policy in question had not been applied to plaintiffs. The court, in so holding, emphasized the important constitutional considerations that prevent federal courts from exercising jurisdiction where the issues are not adequately presented.[18] It is entirely clear from plaintiff's brief that proper interpretation of the Missouri statutes cited above — foundational threshold issues that go to the heart of plaintiff's constitutional claim — will not be adequately presented or litigated by her in this case, where she refuses even to cite the pertinent statutes.

## Conclusion

Based on the authorities and reasons set forth above and in its opening brief, VICC's motion should be granted and plaintiff's complaint should be dismissed.

---

[18] *Id.*, citing, *Public Workers v. Mitchell*, 330 U.S. 75, 90-91 (1947) ("Should the courts seek to expand their power so as to bring under their jurisdiction ill-defined controversies over constitutional issues, they would become the organ of the political theories. Such abuse of judicial power would properly meet rebuke and restriction from other branches."); *see also Howe v. Burwell*, 2015 WL 4479757, at *12 (D. Vt. July 21, 2015) (dismissing claim for lack of standing and ripeness; such dismissal is "a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary. . . , especially, constitutional issues . . ."), citing *N.J. Physicians, Inc. v. Obama,* 653 F.3d 234, 239 (3rd Cir. 2011) (challenge to ACA dismissed for lack of standing where plaintiff had not shown that the statutory exemptions to compliance did not apply to him).

       Respectfully submitted,

       SHANDS, ELBERT,
        GIANOULAKIS & GILJUM, LLP

       */s/Mark J. Bremer*
       Mark J. Bremer #24696MO
       D. Leo Human #59787MO
       1 North Brentwood Blvd., Suite 800
       St. Louis, Missouri 63101
       (314) 241-3963
       (314) 241-2409 – fax
       mbremer@shandselbert.com
       lhuman@shandselbert.com

       Attorneys for Voluntary
       Interdistrict Choice Corporation

## Certificate of Service

 The undersigned hereby certifies that on June 23, 2016, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: Joshua P. Thompson and Wencong Fa, Pacific Legal Foundation, 930 G Street, Sacramento, California 95814.

       */s/Mark J. Bremer*